**FILED**

**JULY 16, 2013**

In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 30219-9-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHRISTOPHER M. FOLEY, | ) | |
| | ) | |
| Appellant. | ) | |

KULIK, J. — Christopher Foley was charged with second degree murder of Russell Ray. Based on the State's theory of the crime, Mr. Foley killed Mr. Ray by hitting him with a 2" x 10" board during a dispute over ownership of tools. A jury found Mr. Foley guilty of the lesser included offense of first degree manslaughter. Mr. Foley appeals. He asserts that the trial court made evidentiary errors, prosecutorial misconduct occurred, and assigns error to the court's decision to instruct the jury on the lesser included offense. He also assigns numerous errors in his statement of additional grounds for review. We conclude that the trial court did not err. We affirm the conviction.

FACTS

Christopher Foley and Russell Ray were brothers-in-law. Mr. Foley's wife, Karen Foley, and Mr. Ray's wife, Christine Ray, are sisters. The couples lived next to each other as well as Ms. Foley's and Ms. Ray's parents, Bob and Connie Collignon, in Ellensburg, Washington. The brothers-in-law were business partners in a construction company until the company stopped being profitable and dissolved. Mr. Foley's and Mr. Ray's relationship deteriorated after the dissolution. The men disagreed over the division of the tools that belonged to the company. Mr. Ray reportedly felt he had been cheated.

Mr. Ray disappeared on June 21, 2010, when most of his family was attending a wedding in California. However, Mr. Foley had returned home on the day of the disappearance. Neighbors and police searched for Mr. Ray or clues to his disappearance, but found nothing significant.

On June 27, a day after Ms. Ray returned, she discovered blood on the fence in her backyard. Ms. Ray called police who discovered blood in several locations outside of the home. With the help of search and rescue volunteers, the police found a 2" x 10" board in the barn covered in blood.

Over the next two days, the Washington State Patrol and the Kittitas County Sherriff's Office collected evidence from the scene. Forensic scientist Brianna Peterson

2

described the scene as a "blood letting." Report of Proceedings (RP) at 1167. On the north side of the property, there was red-brown staining across the length of the property line to the residence and on the residence. There was also blood and hair on tree branches in this area. A significant amount of blood was also located in the immediate backyard by the trampoline. "Saturation" stains and hair were visible on the nearby railroad ties. RP at 1108. Spatters of blood were observed in the grass to the west of the railroad ties.

Ms. Peterson also examined the bloody board found in the barn. Ms. Peterson testified that the four sides of the board had blood transfer marks and blood spatter patterns.

The following March, Mr. Ray's body was found in a ravine off the Vantage Highway. The Kittitas County prosecutor charged Mr. Foley with the second degree murder of Mr. Ray. The amended information alleged that the crime occurred between June 21 and June 22. The State relied on Mr. Foley's and Mr. Ray's long-standing feud over the tools and the failure of the business as motive for the crime.

PROCEDURAL HISTORY

*Evidence of Past Acts.* The State relied on circumstantial evidence in its case against Mr. Foley. To help show motive for the crime, the State introduced three prior altercations between Mr. Ray and Mr. Foley that occurred over the tools.

3

The first instance involved a physical altercation between Mr. Foley and Mr. Ray at a job site in May 2009. Mr. Foley allegedly punched Mr. Ray after the two argued about the tools. Mr. Collignon and Brink Evans witnessed the altercation. In addition, Ms. Ray and Ms. Collignon were told about the incident by Mr. Ray. Ms. Ray photographed the injury.

The second instance involved a verbal exchange in May 2009. The tools were again the subject of the altercation. Mr. Foley described this incident to detectives during his first interview following Mr. Ray's disappearance. Ms. Collignon was told of the incident by Mr. Ray. Mr. Ray perceived this incident as an ambush because Mr. Foley had delayed leaving for work in order to confront Mr. Ray about the tools.

The last instance involved a physical altercation in May 2010. Mr. Foley caught Mr. Ray looking for tools. Mr. Foley allegedly hit Mr. Ray with a 4" x 4" piece of wood. No witnesses were present, but Mr. Ray told details of the incident to his brother, Mark Ray, and to a co-worker, Mark Emmert. Ms. Ray, Ms. Collignon, and Jory Ray observed an injury to Mr. Ray that was consistent with the described incident. Additionally, a photograph taken shortly after the incident by the Department of Licensing demonstrates an injury consistent with the described incident. Mr. Foley denied he participated in this incident.

Mr. Foley argued that the three incidents were not admissible under ER 404(b) because they were propensity evidence. Mr. Foley also contended that the State could not meet its burden to prove that the incident regarding the 4" x 4" board occurred.

The trial court found the incidents were sufficiently proved and admissible under ER 404(b) as evidence of motive, opportunity, and lack of mistake or accident. The court also found the evidence to be relevant and not unfairly prejudicial.

*Recorded Interview.* The State sought to present a video recording of a police interview of Mr. Foley. Mr. Foley was concerned that the State anticipated fast forwarding or muting the sound through portions of the video that were excluded or irrelevant. Mr. Foley requested that if the State were to present the video, it needed to redact those portions. In response, the State said that the system supporting the video evidence did not allow for editing, but the State would work on a solution. In the alternative, the State said it would submit a transcript to the jury, excluding the redacted material. The court agreed. The video was discussed again and the State proposed to play the interview in its entirety for the sake of completeness. No decision was made during this discussion.

During the trial, when the State questioned Detective Greg Bannister about the recorded interview, Mr. Foley objected, claiming that the State's presentation of the

interview evidence was awkward and confusing. In response, the State detailed the

problems with presenting the evidence of the interview. The State explained that playing

portions of the recorded interview was not a viable option because the video could not be

physically altered and portions were inaudible. Also, relying solely on the transcripts of

the video created problems because portions of the interview were transcribed as

inaudible and the jury was entitled to hear that inaudible evidence. However, asking the

detective about the interview would result in leading questions and hearsay objections.

The State said it would be best to admit the transcript and let Detective Bannister answer

the State's questions.

The trial court decided that the transcript could not be introduced into evidence in

the manner the State suggested. The State requested that the court allow the video to be

played in its entirety, skipping over the portions that were impermissible, such as the

reference to the polygraph, and stopping when Mr. Foley objected. The State suggested

that if any inadmissible evidence came in by error, it be cured by a jury instruction. Mr.

Foley complained that he would suffer incredible prejudice from the inadmissible

evidence. Mr. Foley recognized the State's technical issues, but acknowledged that it was

the State's burden to present evidence so it was error free, and such a presentation was

possible.

The court allowed the State to play the entire video and skip over the impermissible portions. The court warned the State that a mistrial would occur if inadmissible evidence was presented. The court determined that the video would not go back to the jury, but would be treated more like a witness statement.

As the State set up the video, Mr. Foley informed the trial court that he was concerned that the State was failing to skip the inadmissible part of the interview where Mr. Foley was advised of his rights. The court reminded the State that it had required the State to come up with an easy and workable way to present the video interview. The State agreed to make a written record of the presentation to document what portions of the video interview were played to the jury and to exclude the portions of the video that were prejudicial or not relevant.

The court expressed that most of the video contained irrelevant material and that playing the video would confuse the jury. However, the court reluctantly allowed the State to play the video for the purpose of impeachment of Mr. Foley. After the court played the video, the court criticized the State for wasting everyone's time with the lengthy video.

In the video, Deputy Darren Higashiyama asked Mr. Foley where Ms. Foley thought Mr. Ray might have gone. Mr. Foley replied that Ms. Foley thought Mr. Ray was

dead. Later in the interview, Detective Higashiyama suggested that some members of Mr. Foley's family were accusing Mr. Foley because of their relationship. However, Detective Higashiyama assured Mr. Foley that Detective Higashiyama was not blaming anyone because he did not know the offender.

This portion of the video was not skipped even though the trial court previously granted Mr. Foley's motion in limine to exclude any evidence pertaining to an opinion of Mr. Foley's guilt.

The video was brought up once more before the jury was instructed. Mr. Foley sought to have the court instruct the jury to disregard the entire video. However, the trial court indicated that it would instruct the jury to disregard portions of the video, if requested. Mr. Foley responded that there were many statements from other people that should not have been allowed, including the statement from the detective that a witness formed an opinion of guilt. The State argued that all statements provided context for the evidence. The State also claimed that it did not remember the language of the statement to know if it was an opinion of guilt.

*Lesser Offense.* During the instructions conference, Mr. Foley requested that the court not give instructions for first degree or second degree manslaughter, which are lesser included offenses of second degree murder. The State requested the instructions,

8

arguing that the instructions were supported by the evidence. The trial court agreed with the State to include the instructions for the lesser included offenses.

A jury found Mr. Foley guilty of first degree manslaughter. Following the verdict, Mr. Foley filed a motion for a new trial on the grounds of prosecutorial misconduct. Mr. Foley argued that the prosecutor committed misconduct by failing to redact the portion of the video interview where detectives asserted that Ms. Ray and Ms. Foley did not believe Mr. Foley's written version of events. The trial court determined that there was no basis for a new trial.

## ANALYSIS

*Evidence of a Prior Altercation.* We review a trial court's ruling on ER 404(b) evidence for an abuse of discretion. *State v. Foxhoven*, 161 Wn.2d 168, 174, 163 P.3d 786 (2007). An abuse of discretion occurs if the court's decision is manifestly unreasonable or based on untenable grounds or untenable reasons. *State v. Dixon*, 159 Wn.2d 65, 75-76, 147 P.3d 991 (2006) (quoting *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

ER 404(b) forbids admitting evidence of a person's other crimes, wrongs, or acts to prove a person's character in order to show that the person acted in conformity with the prior bad acts. A defendant must be tried on evidence relevant to the crime charged, and

9

not convicted because the jury believes he is a bad person who has done wrong in the past. *Foxhoven*, 161 Wn.2d at 175.

However, ER 404(b) allows evidence of such acts if admitted for other purposes, such as to establish motive, opportunity, intent, identity, and the absence of mistake or accident.

"Before admitting ER 404(b) evidence, a trial court 'must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudical effect.'" *Foxhoven*, 161 Wn.2d at 175 (quoting *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). The trial court must conduct this analysis on the record. *Id.*

Courts presume that evidence of a defendant's past acts is inadmissible; any doubts regarding admittance are resolved in favor of the defendant. *State v. Fuller*, 169 Wn. App. 797, 829, 282 P.3d 126 (2012), *review denied*, 176 Wn.2d 1006 (2013).

Evidence of previous quarrels and assaults against the same victim is admissible when motive is relevant to the current offense. *State v. Powell*, 126 Wn.2d 244, 260, 893 P.2d 615 (1995).

10

We decide whether the evidence of other bad acts is more probative than prejudicial by considering the record as a whole and determining whether the trial court articulated the balancing of these two aspects. *Id.* at 264-65. A trial court has broad discretion in balancing the probative value against the prejudicial effect. *State v. Stenson*, 132 Wn.2d 668, 702, 940 P.2d 1239 (1997).

Mr. Foley challenges the trial court's decision to allow the prior altercation where Mr. Foley allegedly hit Mr. Ray with a 4" x 4" piece of wood. Mr. Foley contends that this evidence was not supported by a preponderance of evidence because the State relied on uncorroborated hearsay testimony from Mark Ray as proof of the prior act. Mr. Foley also contends that the evidence's potential for prejudice outweighs its probative value because the incident was too similar to the State's theory of how Mr. Foley was killed, and the State had other evidence to establish Mr. Foley's and Mr. Ray's disagreement over tools.

At trial, Mark Ray testified that he spoke with his brother about the 4" x 4" incident. Mr. Ray told his brother that he was in Mr. Foley's shop to take tools when Mr. Foley hit Mr. Ray with a 4" x 4" board. Mr. Emmert also testified that Mr. Foley told him about the incident. According to Mr. Emmert, Mr. Foley went home to get his boots when he heard someone in his shop. He picked up a 4" x 4" board and hit the

11

person, who turned out to be Mr. Ray. The court allowed this hearsay testimony as statements against interest.

The trial court did not abuse its discretion by allowing the hearsay testimony of Mark Ray to prove the 4" x 4" incident. The statements by Mr. Ray were allowed under the ER 804(b)(3) statement against interest exception to the hearsay rule. Inculpatory hearsay statements against a penal interest are admissible under ER 804(b)(3) if the declarant is unavailable, the statement subjects the declarant to criminal liability to the extent that a reasonable person in the same position as the declarant would not have made the statement unless he believed it was true, and corroborating circumstances clearly indicate the trustworthiness of the statement. *State v. Valladares*, 99 Wn.2d 663, 668, 664 P.2d 508 (1983).

First, no question is raised in regard to Mr. Ray's unavailability to testify. Also, Mr. Ray's statements subjected him to criminal liability for burglarizing Mr. Foley's property. Finally, Mark Ray's statement about the incident was corroborated by Mr. Emmert, who also testified that the incident occurred. Additional support came from other witnesses who testified to seeing an injury on Mr. Ray that was consistent with the incident. Mr. Ray's Department of Licensing photograph taken a few days after the incident also shows the injury. While Mr. Foley denied making the statement to Mr.

12

Emmert, there is no reason to believe the statements from the other witnesses are not credible. Both Mark Ray and Mr. Emmert gave similar testimony, and there is no evidence that the men knew each other.

We conclude that the trial court did not abuse its discretion by admitting the prior bad act. The State proved by a preponderance of the evidence that the incident occurred. Also, the trial court considered the incident involving Mr. Foley and Mr. Ray relevant to establish motive. The State's motive was based on Mr. Foley's and Mr. Ray's longstanding argument over the tools, and this incident provided evidence of that motive.

Furthermore, the court weighed the effects of the evidence and determined that the probative value was significant as this evidence strongly supports the State's motive that Mr. Foley killed Mr. Ray over the conflict surrounding the dissolution of the business and the disposition of the tools. The event happened in Mr. Foley's shop while Mr. Ray was looking for the tools. Mr. Foley was upset and argued with Mr. Ray over the tools. While the State presented other evidence that supports motive, the May 2010 incident involving a 4" x 4" board shows the depth of the disagreement between the men. The record shows that the trial court carefully balanced the probative value of the prior acts against the danger of unfair prejudice. The court did not abuse its discretion by admitting evidence of a prior altercation between Mr. Foley and Mr. Ray.

13

*Jury Instructions.* Alleged errors of law in a trial court's instructions are legal questions that we review de novo. *State v. Porter*, 150 Wn.2d 732, 735, 82 P.3d 234 (2004). When determining whether sufficient evidence supported a jury instruction on a lesser included offense, the court reviews the supporting evidence in the light most favorable to the party requesting the instruction. *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000).

An instruction on a lesser included offense is warranted when "'[f]irst, each of the elements of the lesser offense must be a necessary element of the offense charged[, and,] [s]econd, the evidence in the case must support an inference that the lesser crime was committed.'" *Id.* at 454 (alterations in original) (quoting *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978)).

The second prong of the lesser included offense test requires a factual showing supporting the lesser crime that must be "more particularized than that required for other jury instructions." *Fernandez-Medina*, 141 Wn.2d at 455. "[T]he evidence must raise an inference that *only* the lesser included/inferior degree offense was committed to the exclusion of the charged offense." *Id.* "If the evidence would permit a jury to rationally find a defendant guilty of the lesser offense and acquit him of the greater, a lesser

14

included offense instruction should be given." *State v. Warden*, 133 Wn.2d 559, 563, 947 P.2d 708 (1997).

First and second degree manslaughter are lesser included offenses of intentional murder, and such instruction should be given to the jury when supported by the facts. *State v. Berlin*, 133 Wn.2d 541, 543, 947 P.2d 700 (1997).

First degree manslaughter is committed when a person recklessly causes the death of another person. RCW 9A.32.060(1)(a). Second degree manslaughter is committed when a person, with criminal negligence, causes the death of another person. RCW 9A.32.070(1).

The factual prong is in dispute here. We conclude that the trial court did not err in giving the lesser included instructions of first and second degree manslaughter. The State's motive for the crime is the dispute over the division of tools. Evidence of the prior altercations established that the men were very angry over the tools, and both attempted to reclaim the tools from the other. The killing of Mr. Ray could have resulted from another physical altercation that escalated to the point of a reckless killing. Additionally, the piece of wood used in Mr. Ray's murder is not the type that is brought to intentionally kill someone. Instead, the piece of wood suggests that it was grabbed in the heat of an argument. In sum, the circumstantial evidence suggests that Mr. Foley and Mr.

15

Ray were involved in a spontaneous altercation after Mr. Foley entered Mr. Ray's property looking for tools. The altercation became physical, Mr. Foley hit Mr. Ray with a piece of wood lying in the barn, and Mr. Ray was recklessly killed as a result.

Instructing the jury on the lesser included offenses of first and second degree manslaughter was not error.

*Prosecutorial Misconduct.* "The granting or denial of a new trial is a matter primarily within the discretion of the trial court and we will not disturb its ruling unless there is a clear abuse of discretion." *State v. Wilson*, 71 Wn.2d 895, 899, 431 P.2d 221 (1967). A trial court's decision regarding improper prosecutorial argument is reviewed for an abuse of discretion. *State v. Cheatam*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003).

A prosecutor is a quasi-judicial officer who has a duty to ensure a defendant in a criminal prosecution is given a fair trial. *State v. Boehning*, 127 Wn. App. 511, 518, 111 P.3d 899 (2005).

A defendant claiming prosecutorial misconduct who has preserved the issues by objection bears the burden of establishing the impropriety of the prosecuting attorney's actions and their prejudicial effect. *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)). A defendant establishes prejudice if there is a substantial likelihood that the misconduct affected the

16

jury's verdict. *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003) (quoting *State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995)).

Even with no objection, reversal is still required when the misconduct is so flagrant and ill-intentioned it causes enduring prejudice that could not have been cured by instruction. *Boehning*, 127 Wn. App. at 518. It is misconduct for a prosecutor to flagrantly violate a court order regarding the admissibility of evidence. *State v. Smith*, 189 Wash. 422, 428-29, 65 P.2d 1075 (1937).

Expressions of personal belief as to the guilt of the defendant are clearly inappropriate for opinion testimony in criminal trials. *State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008). Both direct and implied opinions of guilt are improper. *Id.* at 594.

Mr. Foley contends that the prosecutor committed misconduct and deprived Mr. Foley of a fair trial by offering as evidence the unredacted video interview that included witness opinion on Mr. Foley's guilt. Mr. Foley contends that the prosecutor knew the video contained objectionable material, but chose to play it anyway. While Mr. Foley objected to the playing of the video in its entirety, he did not object to the opinion statements when they were introduced. In contrast, the

17

State contends that the statements made by detectives are not impermissible opinion testimony.

Two portions of the police video interview of Mr. Foley by Detective Higashiyama are challenged as opinion evidence. The first portion contained the following dialogue:

> HIGASHIYAMA: Have you talked to your wife . . .
> FOLEY: . . . California.
> HIGASHIYAMA: . . . about where Russel [sic] might've gone?
> FOLEY: She thinks he's dead.

Clerk's Papers (CP) at 397. The second portion is as follows:

> HIGASHIYAMA: So you know that the family's going to be very upset over this, right? Because some family members, not all of 'em are pointing a finger but they're pointing at, at you, but just because of the relationship.
> FOLEY: Yeah.
> HIGASHIYAMA: Kay, we're not pointing the finger at anybody cause we don't know.
> FOLEY: Yeah. No that's fine.
> HIGASHIYAMA: So you're okay with the family and holding that shadow over your head?
> FOLEY: Yeah I'm fine with it.

CP at 419.

We conclude that the second portion of the video interview contains an opinion regarding Mr. Foley's guilt. Detective Higashiyama's testimony that some of the family members were pointing a finger at Mr. Foley because of the relationship implies that the family members thought Mr. Foley was guilty of killing Mr. Ray over the business and

18

the tools. While this opinion was given in a video format and not direct testimony of a witness, the trial court treated the interview as a witness statement because of the difficulty in questioning Detective Higashiyama. As such, we treat this interview as a witness statement and conclude that the opinion testimony was improperly introduced by the prosecution.

However, the prosecutor's introduction of this evidence did not constitute misconduct because the prosecutor's actions were not flagrant and ill-intentioned. The evidence does not lead to a conclusion that the prosecutor sought to play the video in order to get in evidence that otherwise would have been recognized as inadmissible. The prosecutor attempted to introduce the evidence of the interview without playing the video, but it was found to be too confusing. The prosecutor also was able to skip over other portions of inadmissible material, which infers that the prosecutor was attempting to omit the material.

Also, the introduction of the material did not cause enduring prejudice that could not have been cured by instruction. The detective's statement regarding the family's opinion of guilt was not highlighted evidence in the trial. The opinion testimony was buried in the lengthy interview. The court recognized that most of the video interview was irrelevant and a waste of time. Detective Higashiyama lessened the prejudicial

19

impact of the statement when he immediately responded to Mr. Foley that he did not support the opinion of the family. This statement stifled any enduring prejudice that may have arisen from the testimony. Any prejudice could have been cured by a limiting instruction. The court offered to give an instruction, but Mr. Foley declined.

Prosecutorial misconduct did not deprive Mr. Foley of his right to a fair trial.

*Ineffective Assistance of Counsel.* We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

The federal and state constitutions guarantee the right to effective representation. U.S. CONST. amend. VI; CONST. art. I, § 22. To prevail on an ineffective assistance of counsel claim, trial counsel's conduct must have been deficient in some respect, and that deficiency must have prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Performance is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Prejudice results if the outcome of the trial would have been different had defense counsel not rendered deficient performance. *Id.* at 337.

Where a defendant claims that his or her counsel was ineffective for failing to make a particular motion, "[a]bsent an affirmative showing that the motion probably

20

would have been granted, there is no showing of actual prejudice." *Id.* at 337 n.4.

Courts engage in a strong presumption that counsel's representation was effective. *Id.* at 335.

We conclude that Mr. Foley's counsel's failure to request a limiting instruction could have been tactical. Counsel recognized that a comment on guilt was included in the video interview and could have chosen to avoid additional attention to the statement by refusing a limiting instruction.

And, we cannot conclude that the failure to request a limiting instruction prejudiced Mr. Foley. As previously discussed, the evidentiary value of the opinion evidence was not highlighted or heavily weighted. The opinion evidence was buried in an extensive, lengthy video interview and immediately discredited by Detective Higashiyama. As a result, we conclude that Mr. Foley's right to effective assistance of counsel was not violated.

## STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

RAP 10.10(c) states that reference to the record and citation to authorities are not required in statements of additional grounds for review (SAG). However, the rule also states that the appellate court will not consider the SAG for review if the SAG does not inform the court of the nature and occurrence of the alleged errors. Generally, the

21

appellate court is not obligated to search the record in support of claims made in a defendant/appellant's SAG. RAP 10.10(c).

In his SAG, Mr. Foley generally informs this court of the nature and occurrence of the alleged errors, but fails to direct us to the portion of the extensive record where the facts supporting the alleged errors can be found. Our review of Mr. Foley's claims are based on our knowledge of the record, in accordance with RAP 10.10(c). We conclude that his SAG contentions are without merit.

We affirm the conviction for the crime of first degree manslaughter.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Kulik, J.

WE CONCUR:

_____
Brown, J.

_____
Korsmo, C.J.